**Appeal No. 25-7832**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Orlando Salas, Brian Steacy, Paul Papanek
*Plaintiffs-Appellants*,

v.

Whirlpool Corporation, et al.
*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
NO. 5:23-cv-01549-AB-DTB
HON. ANDRÉ D. BIROTTE

## APPELLANTS' OPENING BRIEF

Glenn A. Danas (270317)
Christen L. Chapman (332245)
CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265
Tel. (213) 788-4050
gdanas@clarksonlawfirm.com
cchapman@clarksonlawfirm.com

Evan E. Sumer (329181)
CONSUMER LAW FIRM, P.C.
145 Corte Madera Town Center,
No. 464
Corte Madera, CA  94925
Tel. (415) 294-1966
ems@consumerlaw.us

*Attorneys for Plaintiffs-Appellants Orlando Salas, Brian Steacy, and
Paul Papanek*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................... 1

ISSUES PRESENTED ........................................................................ 4

STATEMENT OF JURISDICTION ...................................................... 5

STATEMENT OF THE CASE ............................................................. 6

    A.   Defendants jointly advertise Service Plans to recent
          appliance purchasers. ................................................................. 6

    B.   The Service Contract's buyout provision allows
          Defendants to terminate the Service Plan's coverage by
          paying a depreciated cash settlement for the appliance. ............. 7

    C.   Defendants exercise the buyout option based on an
          undisclosed payout limit and condition payment on
          destruction of the appliance—neither of which are
          disclosed in the Service Contract. ............................................. 9

    D.   Appellant Salas purchased a Service Plan through
          Whirlpool's webpage. ................................................................ 10

    E.   Appellant Papanek purchased a Service Plan through a
          marketing letter. ...................................................................... 14

    F.   Appellant Steacy purchased a Service Plan through a
          marketing letter and, upon filing a claim, was offered
          only an inadequate buyout conditioned on his destruction
          of the appliance. ....................................................................... 18

    G.   The district court dismisses the original complaint with
          leave to amend, and Appellants file a Second Amended
          Complaint. ............................................................................... 19

    H.   The district court dismisses the Second Amended
          Complaint and denies further leave to amend. ......................... 20

    I.    Appellants timely appeal. ......................................................... 22

STANDARD OF REVIEW......................................................................22

SUMMARY OF THE ARGUMENT ......................................................23

ARGUMENT ........................................................................................27

    I.    Appellants plausibly alleged Defendants' advertising of the Service Plans violated the CLRA, FAL, and UCL, and the district court erred in concluding otherwise.........................27

        A.    The reasonable consumer standard does not require consumers to consult contracts, and the Service Contract's availability does not cure deceptive advertising as a matter of law. ..........................................29

        B.    The Letter misleads reasonable consumers about the nature and duration of the Service Plan's coverage............37

            1.    The Letter misleads reasonable consumers into believing the Service Plan offers repair-or-replacement coverage comparable to the manufacturer's warranty for the full term of the plan.......................................................................37

            2.    The asterisk and fine-print, generic qualifier do not cure the deception.................................................44

        C.    The Webpage similarly misleads reasonable consumers about the nature and duration of coverage, and the qualifiers do not cure the deception.........................................................................57

            1.    The Webpage misleads reasonable consumers into believing the Service Plan offers repair-or-replacement coverage comparable to the manufacturer's warranty for full term of the plan, and the superscript qualifier does not cure the deception. ...........................................................57

            2.    The fine-print, generic qualifier at the bottom of the Webpage does not cure the deception. ...................63

D. The representations in the Letter and Webpage triggered a duty to disclose the buyout provision, the undisclosed payout limit that drives buyout decisions, and the proof-of-destruction requirement............ 65

II. The district court erroneously found Appellants did not seek restitution under the UCL when their allegations and prayer for relief establish otherwise. ................................... 70

III. The district court abused its discretion in denying leave to amend. ............................................................................... 71

CONCLUSION .................................................................................. 73

CERTIFICATE OF COMPLIANCE...................................................... 75

CERTIFICATE OF SERVICE............................................................. 76

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Apple, Inc.*,
  500 F. Supp. 3d 993 (N.D. Cal. 2020) ................................................. 66

*Anthony v. Pharmavite*,
  No. 18-CV-02636-EMC,
  2019 WL 109446 (N.D. Cal. Jan. 4, 2019) ........................................... 50

*Bell v. Publix Super Markets, Inc.*,
  982 F.3d 468 (7th Cir. 2020) ................................................................. 30

*Bodenburg v. Apple Inc.*,
  146 F.4th 761 (9th Cir. 2025) ............................................................... 32

*Brady v. Bayer Corp.*,
  26 Cal. App. 5th 1156 (2018) ................................................. 30, 34, 52

*Carvalho v. HP, Inc.*,
  No. 21-CV-08015-BLF,
  2022 WL 2290595 (N.D. Cal. June 24, 2022) ..................................... 47

*Chabolla v. Classpass Inc.*,
  129 F.4th 1147 (9th Cir. 2025) ............................................................. 64

*Chapman v. Skype Inc.*,
  220 Cal. App. 4th 217 (2013) ................................... 33, 35, 50, 51, 60

*Chern v. Bank of America*,
  15 Cal. 3d 866 (1976) ........................................................................... 35

*Collins v. eMachines, Inc.*,
  202 Cal. App. 4th 249 (2011) ........................................................ 65, 66

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) .............................................................. 66

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) ............................................................... 32

*Dinan v. Sandisk LLC,*
  No. 18-CV-05420-BLF,
  2019 WL 2327923 (N.D. Cal. May 31, 2019) ...................................... 46

*DotStrategy Co. v. Twitter Inc.,*
  476 F. Supp. 3d 978 (N.D. Cal. 2020) ................................................. 36

*Dowers v. Nationstar Mortg., LLC,*
  852 F.3d 964 (9th Cir. 2017) ............................................................. 22

*Ebner v. Fresh, Inc.,*
  838 F.3d 958 (9th Cir. 2016) ............................................................. 34

*Floersheim v. FTC,*
  411 F.2d 874 (9th Cir. 1969) ............................................................. 49

*Freeman v. Time, Inc.,*
  68 F.3d 285 (9th Cir. 1995) ......................................................... 33, 46

*FTC v. Cyberspace.Com LLC,*
  453 F.3d 1196 (9th Cir. 2006) ........................................................... 34

*FTC. v. On Point Cap. Partners LLC,*
  17 F.4th 1066 (11th Cir. 2021).......................................................... 53

*Haskell v. Time, Inc.,*
  857 F. Supp. 1392 (E.D. Cal. 1994)................................................... 33

*Hodsdon v. Mars, Inc.,*
  891 F.3d 857 (9th Cir. 2018) ............................................................. 65

*Horne v. Harley-Davidson, Inc.,*
  660 F. Supp. 2d 1152 (C.D. Cal. 2009)............................................... 39

*Kang v. P.F. Chang's China Bistro, Inc.,*
  844 F. App'x 969 (9th Cir. 2021)....................................................... 46

*Krainski v. Nevada ex rel. Bd. of Regents of NV. System of
  Higher Educ.,*
  616 F.3d 963 (9th Cir. 2010) ............................................................. 72

v

*Kwikset Corp. v. Superior Ct.*,
  51 Cal. 4th 310 (2011) ...........................................................................71

*Lavie v. Procter & Gamble Co.*,
  105 Cal. App. 4th 496 (2003)..............................................................35

*Madrid v. Perot Sys. Corp.*,
  130 Cal. App. 4th 440 (2005)..............................................................70

*Malheur Forest Fairness Coal. v. Iron Triangle, Ltd. Liab. Co.*,
  164 F.4th 710 (9th Cir. 2026).......................................................22, 23

*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007 (9th Cir. 2020) .............................................................28

*Nationwide Biweekly Admin., Inc. v. Superior Ct.*,
  9 Cal. 5th 279 (2020) ...........................................................................32

*People ex rel. Gascon v. HomeAdvisor, Inc.*,
  49 Cal. App. 5th 1073 (2020)..............................................................33

*People v. Wahl*,
  39 Cal. App. 2d Supp. 771 (1940).......................................................39

*Prata v. Superior Court*,
  91 Cal. App. 4th 1128 (2001)........................................................51, 60

*Removatron Int'l Corp. v. FTC*,
  884 F.2d 1489 (1st Cir. 1989).............................................................54

*Resort Car Rental Sys., Inc. v. F.T.C.*,
  518 F.2d 962 (9th Cir. 1975) ...............................................................36

*Rubio v. Capital One Bank*,
  613 F.3d 1195 (9th Cir. 2010) ..............................................33, 36, 52

*Salazar v. Walmart, Inc.*,
  83 Cal. App. 5th 561 (2022)................................................................30

*Schneider v. Chipotle Mexican Grill, Inc.*,
  328 F.R.D. 520 (N.D. Cal. 2018) ........................................................55

*Shaeffer v. Califia Farms, LLC,*
  44 Cal. App. 5th 1125 (2020)..................................................................39

*Skinner v. Ken's Foods, Inc.,*
  53 Cal. App. 5th 938 (2020)...................................................................30

*Sperling v. Stein Mart, Inc.,*
  No. CV-15-01411 BRO(KKk),
  2016 WL 11265686 (C.D. Cal. Mar. 15, 2016) ....................................55

*United States ex rel. Lee v. Corinthian Colls.,*
  655 F.3d 984 (9th Cir. 2011) ..........................................................72, 73

*Whiteside v. Kimberly Clark Corp.,*
  108 F.4th 771 (9th Cir. 2024).......................................................*passim*

*Williams v. Gerber Prods. Co.,*
  552 F.3d 934 (9th Cir. 2008) ...............................................27, 28, 30

## Statutes

Cal. Bus. & Prof. Code § 17200 ...............................................................20

Cal. Bus. & Prof. Code § 17203 .................................................................5

Cal. Bus. & Prof. Code § 17500 ...............................................................20

Cal. Civ. Code § 1750 ...............................................................................20

## Other Authorities

*In the Matter of Intuit Inc.,*
  2024 WL 382358..................................................................................53

## INTRODUCTION

After consumers buy Whirlpool appliances, Defendants[1] contact them urging them to buy a Service Plan to protect their new appliances. Through letters, emails, and webpages bearing the manufacturer's branding, Defendants presented the Service Plan as providing a continuation of the repair-or-replacement coverage provided under the manufacturer's warranty. The marketing letter emphasized no out-of-pocket expenses for covered repairs and replacements, 100% parts and labor for covered repairs, and the quality of service associated with the appliance's brand. The marketing webpage likewise emphasized repair-oriented benefits, certified parts and technicians, additional years of brand-backed coverage beyond the manufacturer's warranty, and a promise that only if the appliance could not be fixed, Defendants would replace it or provide reimbursement. Appellants Orlando Salas, Paul Papanek, and Brian Steacy (collectively, "Appellants") viewed those representations—Salas on the webpage and Papanek and Steacy in the letter—and understood them to mean the Service Plans would provide

---

[1] "Defendants" refers to Defendants-Appellees Whirlpool Corporation ("Whirlpool") and AIG WarrantyGuard, Inc. ("AIGWG") collectively.

1

repair-or-replacement coverage comparable to the manufacturer's warranty for the full term purchased and bought the plans on that understanding.

But the Service Plans operated much differently in practice. The plans gave Defendants the right, in their sole discretion and regardless of repairability, to resolve claims through a buyout by paying a depreciated cash settlement that ended the plan's remaining coverage. Defendants used an undisclosed payout limit driven by profitability to decide when to exercise a buyout, regardless of whether an appliance could be repaired, and required consumers to destroy the appliance to receive payment. Those features materially changed both the nature and duration of the promised repair-or-replacement coverage and were not disclosed by any fine-print qualifiers on the letter or webpage.

Under California's consumer protection laws, an advertiser may not make affirmative representations about the product or service a consumer is buying, then defeat a deception claim at the pleading stage by pointing to generic qualifiers or the underlying contract. Yet that is what the district court allowed here when it dismissed Appellants' claims

2

brought under California's Consumer Legal Remedies Act ("CLRA"), False Advertising Law ("FAL"), and Unfair Competition Law ("UCL").[2]

The district court held, as a matter of law, that reasonable consumers were categorically expected to consult the underlying contract when purchasing a service and the mere availability of the underlying contract cured any deception. Neither conclusion can be reconciled with this Court's precedent or California law. The court also improperly resolved against Appellants, as a matter of law, the factual questions of whether a reasonable consumer would notice and follow qualifiers to the underlying contract and whether the marketing materials were likely to mislead.

The district court's additional ruling compounded the error. Although the court acknowledged that Appellants adequately alleged a viable theory of economic harm from purchasing Service Plans that were inferior to what was promised, it separately concluded that Appellants did not seek restitution under the UCL and therefore lacked standing to

---

[2] Appellants also raised additional claims in their Second Amended Complaint that are not the subject of this appeal.

3

pursue their UCL claims. The Second Amended Complaint alleges otherwise.

The central question on appeal is whether Appellants plausibly alleged that Defendants' advertising misled reasonable consumers about the nature and duration of the Service Plan's coverage. They did. The district court's dismissal of Appellants' CLRA, FAL, and UCL claims should be reversed, and those claims should be remanded for further proceedings.

## ISSUES PRESENTED

1. Whether the district court erred by dismissing Appellants' CLRA, FAL, and UCL claims, where Defendants' advertisements of Service Plans would mislead reasonable consumers into believing the Service Plans provide repair-or-replacement coverage comparable to the manufacturer's warranty for the full plan term, when in fact Defendants may instead terminate coverage by paying a depreciated cash settlement regardless of the repairability of the appliance, and where the qualifiers did not cure that deception as a matter of law.

2. Whether the district court erred by holding Appellants lacked standing to pursue their UCL claims because they did not seek restitution, where the Second Amended Complaint expressly alleges entitlement to restitution, invokes California Business and Professions Code section 17203, seeks "appropriate monetary relief," and alleges overpayment injuries the district court recognized as a viable theory of economic harm under the UCL.

3. Whether the district court abused its discretion by denying leave to amend, where two of the three Appellants had never previously amended and challenged a different advertisement than the one at issue in prior pleadings, and the third Appellant's amendment history did not establish futility given only one of his amendments was in response to a court order.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 because the putative class exceeds 100 members, the aggregate amount in controversy exceeds $5,000,000, and there is minimal diversity since both Defendants are incorporated in Delaware, Whirlpool is headquartered in Michigan, AIGWG is

headquartered in Chicago, and Appellants are citizens of California. 2-ER-206–207. On October 30, 2025, the district court dismissed Appellants' claims with prejudice, fully disposing of all claims in the action. 1-ER-3–41. The district court entered final judgment on November 12, 2025. 1-ER-2.

On December 11, 2025, Appellants timely appealed. 3-ER-463; Fed. R. App. P. 4(a)(1)(A). Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

Through this action, Appellants challenge Defendants' deceptive advertisement of the Service Plans as providing repair-or-replacement coverage comparable to the manufacturer's warranty, when in fact the plans contain a buyout provision allowing Defendants to terminate coverage by paying a depreciated cash settlement.

**A.** **Defendants jointly advertise Service Plans to recent appliance purchasers.**

Whirlpool sells home appliances under the brand names Whirlpool, KitchenAid, Maytag, Amana, and JennAir and provides a limited manufacturer's warranty for eligible appliances. 2-ER-207–208. Defendants advertised, sold, and administered extended repair plans

6

("Service Plans") that began when the manufacturer's warranty ended, for one to five additional years. 2-ER-200 ¶ 1; 2-ER-208 ¶ 40.

Defendants advertised Service Plans under the appliance's brand name (e.g., KitchenAid Service Plan) and marketed them through websites as well as by letter and email to purchasers who registered their appliances with Whirlpool. 2-ER-200–201; 2-ER-208 ¶ 41. Letters and emails directed purchasers to Whirlpool-branded websites, such as whirlpool.com or kitchenaid.com, and calling the phone number on the letter reached a recording that identified the applicable brand. 2-ER-201 ¶ 6; 2-ER-208 ¶ 41. AIGWG offered the Service Plans while Whirlpool administered them by responding to requests, arranging repairs, and handling complaints. 2-ER-200 ¶ 2; 2-ER-208 ¶¶ 42–43; *see also* 2-ER-231–234. Purchasers contacted Whirlpool about their Service Plans because they believed that Whirlpool was responsible for them. 2-ER-208 ¶ 44; 2-ER-209; *see also* 2-ER-270–275.

## B. The Service Contract's buyout provision allows Defendants to terminate the Service Plan's coverage by paying a depreciated cash settlement for the appliance.

Under the Service Contract, Defendants had the option, at their sole discretion, to refuse to repair or replace the covered appliance and

instead pay the purchaser a depreciated cash settlement, referred to as a "buyout." 2-ER-226; 2-ER-287 §§ 11, 14.[3] The buyout amount was the greater of the annual cost of the Service Plan or an amount calculated by applying a depreciation schedule to the appliance's original purchase price (excluding taxes, delivery, and installation fees). 2-ER-226; 2-ER-287 § 14. Under the depreciation schedule, the buyout was 75 percent of the original purchase price for appliances one to five years old, 45 percent for five to ten years, and 25 percent for ten to fifteen years—amounts insufficient to cover the cost of a replacement appliance. 2-ER-203 ¶ 12; 2-ER-287 § 14.

A buyout terminated all remaining coverage. 2-ER-226 ¶ 114(d); 2-ER-286. The appliance became Defendants' property and could be required to be returned at Defendants' expense. 2-ER-226 ¶ 114(e); 2-ER-287.

---

[3] Two versions of the Service Contract were attached to the Second Amended Complaint. 2-ER-265–268; 2-ER-286–291. The district court treated the version in effect when Salas purchased his Service Plan in September 2022 (2-ER-286–291) as representative of each Appellant's Service Contract. 1-ER-5. All references to the Service Contract are to the version the district court relied on.

**C. Defendants exercise the buyout option based on an undisclosed payout limit and condition payment on destruction of the appliance—neither of which are disclosed in the Service Contract.**

Whether Defendants invoked the buyout depended on an undisclosed payout limit that did not appear in the marketing materials or the Service Contract. 2-ER-227 ¶ 115(b). When estimated repairs exceeded this limit, Defendants routinely exercised a buyout rather than repaired the appliance—even when it could be repaired and regardless of whether it was the purchaser's first claim—terminating all remaining coverage. 2-ER-227–228 ¶ 115(c), (e). The undisclosed payout limit was known to third-party repair contractors but not to consumers. 2-ER-227 ¶ 115(b).

To receive the cash settlement, the purchaser had to agree in writing to destroy or scrap the appliance, render it unusable, destroy its serial number tags, and dispose of it at the purchaser's own expense. 2-ER-228–229 ¶ 116(a)–(b). The Service Contract did not disclose this requirement. 2-ER-229 ¶ 116(b). If a purchaser refused to sign the proof-of-destruction affidavit, Defendants refused to pay the cash settlement. 2-ER-229 ¶ 116(d).

The Service Plan provided coverage materially inferior to the manufacturer's warranty because the buyout provision allowed Defendants to avoid repairing or replacing the appliance, terminate the Service Plan before its term expires, and require purchasers to destroy the appliance to receive the cash settlement. 2-ER-230–231 ¶ 119.

## D. Appellant Salas purchased a Service Plan through Whirlpool's webpage.

Around July 21, 2022, Salas purchased a Whirlpool range and registered it with Whirlpool. 2-ER-210. About a month later, Defendants emailed Salas urging him to purchase a Service Plan, stating: "Now is the time to protect your appliance with a Whirlpool Service Plan. A Whirlpool Service Plan offers exceptional value and provides peace of mind knowing your Range is protected in the event of an issue." *Id*. Salas clicked a link labeled "Learn More about Whirlpool Service Plan," which took him to Whirlpool's webpage (the "Webpage") where Service Plans were advertised and sold. *Id*.

On the Webpage, Salas viewed the following advertisement for the Service Plan:

10

**Top 5 Coverage Features**

- No Deductible
- 100% Factory Certified Parts and Technicians
- Only Pre-Qualified Technicians
- U.S. Based Customer Care Center
- If We Can't Fix It – We Replace It[3]

Learn More

| Major Component | Cost of Repair Without a Plan[2] | Average 1-Year Service Plan Price |
|---|---|---|
| Washer Pump | $424 | $53 |
| Dryer Control Assembly | $430 | $51 |
| Dishwasher Main Motor | $410 | $46 |
| Refrigerator Compressor | $805 | $106 |
| Range Thermostat | $396 | $56 |

[2]Includes average parts and labor costs. Actual incidents and repair costs may vary.
[3]A replacement may be of like kind and quality, or in the form of a reimbursement based on the product's original price and age. See the complete terms and conditions for details.

**Additional Years of Whirlpool Quality Coverage**



| Standard Warranty | +1 | +2 | +3 | +4 | +5 (Best Value) |

1 Year (Typically)   Additional Years of Coverage Available

A Whirlpool Service Plan provides reliable coverage, with 100% certified parts and technicians, over the lifetime of your product. Act now to stay covered beyond the limited manufacturer's warranty period.



Get Started

Questions? Call 866-265-2137

[1]Quotes and offers for eligible plans depend on accurate product information. If any product information entered above is incorrect and you purchase a plan on an ineligible product, we may cancel the plan immediately upon discovery and refund any plan payments that you made.

Whirlpool Service Plans are offered, sold and issued by AIG WarrantyGuard, Inc., 650 Missouri Avenue, Jeffersonville, IN 47130, an affiliate of American International Group, Inc. (AIG). Limitations and exclusions apply. See the complete terms and conditions. Whirlpool is not affiliated with AIG or any of its affiliates. Whirlpool trademarks used with permission.

®/™ © 2024 Whirlpool. All rights reserved. All other trademarks are owned by their respective companies.

Terms of Use  |  Privacy

2-ER-157; *see also* 2-ER-210–211 ¶ 50.

The Webpage highlighted the top five coverage features of the Service Plan as: "No Deductible"; "100% Factory Certified Parts and

Technicians"; "Only Pre-Qualified Technicians"; "U.S. Based Customer Care Center"; and "If We Can't Fix It – We Replace It.[2]" 2-ER-157. The superscript directed consumers to language stating "A replacement may be of like kind and quality, or in the form of a reimbursement based on the product's original price and age. See the complete underline terms and conditions for details." *Id.*

The Webpage also described the Service Plan as "Additional Years of Whirlpool Quality Coverage" above a bar graph depicting the standard warranty (one year) followed by five contiguous bars representing additional years of coverage, with a "Best Value" callout pointing to the five-year option. 2-ER-157. Below the bar graph, the advertisement stated: "A Whirlpool Service Plan provides reliable coverage, with 100% certified parts and technicians, over the lifetime of your product. Act now to stay covered beyond the limited manufacturer's warranty period." *Id.*

Fine print at the bottom of the Webpage stated:

> Whirlpool Service Plans are offered, sold and issued by AIG WarrantyGuard, Inc. 650 Missouri Avenue, Jeffersonville, IN 47130, an affiliate of American International Group, Inc. (AIG). Limitations and exclusions apply. See the complete terms and conditions. Whirlpool is not affiliated with AIG or any of its affiliates. Whirlpool trademarks used with permission.

2-ER-157; *see also* 2-ER-222–225.

Salas understood the Service Plan to provide all repairs needed on his appliance for the plan's term at no additional cost, or a replacement if repair was not possible—the same type of protection as the manufacturer's warranty for up to five additional years. 2-ER-211 ¶ 51; 2-ER-213 ¶ 57; 2-ER-214 ¶ 60.

Salas also viewed the following infographic on Whirlpool's website:



2-ER-213. Salas understood this to mean the Service Plan would extend his manufacturer's warranty by three years, and nothing on the website indicated that coverage could end through a buyout. 2-ER-213–214.

In reliance on the Webpage's representations, Salas purchased a Service Plan on September 13, 2022, without noticing or reviewing a link to the Service Contract. 2-ER-214 ¶ 62. Had Salas known the

13

representations he relied on were not accurate, he would not have purchased the Service Plan. 2-ER-215 ¶ 67.

**E.     Appellant Papanek purchased a Service Plan through a marketing letter.**

Around March 2022, Papanek purchased a KitchenAid dishwasher. 2-ER-215 ¶ 68. After registering the appliance, Papanek received a marketing letter (the "Letter")[4] advertising the Service Plan:

---

[4] The advertisement in the Letter is also being challenged under the Washington Consumer Protection Act in a related pending appeal, *Shellenberger v. AIG WarrantyGuard, Inc., et al.*, No. 25-1448.

**KitchenAid**

**Important Customer Information For:**

Paul Papanek                                    20
2133 Wellington Rd
Los Angeles CA  90016-1826

**Time is Limited – Protect Your Product**

Dear Paul,

Don't risk potential unexpected repairs on your KitchenAid Dishwasher when you can conveniently get the protection of a KitchenAid Service Plan. Remember, no one is more committed to bringing you the quality of service you'd expect than KitchenAid!

**KitchenAid Service Plan Benefits***

- **No Service Fee:** No out-of-pocket expenses on covered repairs and replacements.
- **Customer Satisfaction:** U.S. based customer care center.
- **Valuable Protection:** 100% parts and labor for covered repairs, where applicable.
- **Service by KitchenAid:** Only authorized technicians.

**Planning now will save you time and money in the years to come.**

Sincerely,

*Maria Perez*

Maria Perez
KitchenAid Service Plan Team

**There is a 60-day wait period from your contract purchase date before coverage will begin.**

**THREE EASY WAYS TO GET STARTED**

**Go Online**
serviceplans.kitchenaid.com Using Invitation Number and Authorization Code below

**Complete and Mail**
Using the coupon below

**Call 866-265-9219**
Monday to Friday: 9:00am-9:00pm EST, Saturday: 9:00am-5:30pm EST
Servicio al cliente disponible en español a solicitud. Comuníquese al 866-265-9219.

## Time is Limited to Protect Your Product

| Invitation Number: 9550-96-4474 | Authorization Code: 0171-25-6914 | Offer Expires: 04/24/2024 |
|---|---|---|
| **Product** | **Model #** | **Serial #** |
| Dishwasher | KDTM404KPS | FB0301057 |

**SAVE:** 50% by purchasing 3 years of coverage.

**If you have already responded, please disregard this letter.**

*KitchenAid Service Plans are offered, sold and issued by AIG WarrantyGuard, Inc., 650 Missouri Avenue, Jeffersonville, IN 47130, an affiliate of American International Group, Inc. (AIG). Limitations and exclusions apply. See the complete terms and conditions at serviceplans.kitchenaid.com/details. KitchenAid is not affiliated with AIG or any of its affiliates. KitchenAid trademarks used with permission.

▼ Detach and return in the enclosed envelope ▼                    FLR-ANY-KIT-01049

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Invitation Number: 9550-96-4474                    Offer Expires: 04/24/2024                    LAP04M-2-KIT-1-LV4-S36-SD2024-03-1

**STEP 1:** Select a Plan

| Term | 3 Year | 2 Year | 1 Year |
|---|---|---|---|
| Price | $880.95 | $586.95 | $293.95 |
| Savings | −$440.48 | −$176.09 | −$0.00 |
| Tax | $0.00 | $0.00 | $0.00 |
| **YOU PAY** | ☐ **$440.47** | ☐ **$410.86** | ☐ **$293.95** |
| Installment Options* | 4 Payments ☐ $110.12 | 4 Payments ☐ $102.72 | 4 Payments ☐ $73.49 |

Save 50%

*Checks and money orders are not eligible for installment plans. Your credit or debit card will be billed automatically until plan is paid in full.

COUPON SHOULD NOT BE USED TO MAKE PAYMENTS ON EXISTING CONTRACTS

**STEP 2:** Select a Payment Method

☐ **Charge my Credit Card** (Charge will appear as Appliance Svc Plan)

☐ VISA®  ☐ MasterCard®  ☐ American Express®  ☐ Discover®

Card Number                                        Exp. Date (MM/YY)

Signature : _____

☐ Full payment of $_____, payable to: **KitchenAid Service Plans** is enclosed.

**Checks are ONLY accepted if paying in full.**

Paul Papanek
2133 Wellington Rd
Los Angeles CA 90016

☐ Check here if you made changes on back of form.

15

2-ER-197; *see also* 2-ER-216.[5]

The Letter advertised "KitchenAid Service Plan Benefits*":

- **No Service Fee**: No out-of-pocket expenses on covered repairs and replacements.
- **Customer Satisfaction**: U.S. based customer care center.
- **Valuable Protection**: 100% parts and labor for covered repairs, where applicable.
- **Service by KitchenAid**: Only authorized technicians.

2-ER-197 (emphasis in original).

The asterisk after "KitchenAid Service Plan Benefits*" directed consumers to the following language:

> KitchenAid Service Plans are offered, sold and issued by AIG WarrantyGuard, Inc., 650 Missouri Avenue, Jeffersonville, IN 47130, an affiliate of American International Group, Inc. (AIG). Limitations and exclusions apply. See the complete terms and conditions at serviceplans.kitchenaid.com/details. KitchenAid is not affiliated with AIG or any of its affiliates. KitchenAid trademarks used with permission.

2-ER-197.

---

[5] In the district court, Whirlpool asserted that this version of the letter was sent to Papanek after he purchased his Service Plan and provided a different letter that was sent to Papanek on May 20, 2022, before he purchased his Service Plan. 2-ER-192 ¶¶ 5, 6. The district court did not consider the first version of the letter, finding it irrelevant and, nonetheless, found that both versions of the letter contained the same at-issue language. 1-ER-8 n.4.

16

Papanek understood the Letter as an offer to extend his KitchenAid manufacturer's warranty. 2-ER-216. Nothing in the Letter indicated that coverage could be terminated before the end of the plan if Defendants chose to exercise a buyout. 2-ER-217 ¶ 71. In reliance on the Letter's representations, Papanek purchased a three-year Service Plan rather than the lower-priced, shorter plans, detaching and mailing the coupon at the bottom of the letter with a $125.00 check. 2-ER-217 ¶¶ 71, 73.

Around December 2023, Papanek experienced a problem with his dishwasher and filed a claim under his Service Plan. 2-ER-217 ¶ 74. AIGWG told Papanek that the problem, the result of a design defect, was not covered under the Service Plan. *Id*. Papanek then sought assistance from Whirlpool to no avail. 2-ER-217 ¶¶ 75–76. Through this process, Papanek learned the Service Plan did not provide coverage comparable to the manufacturer's warranty. 2-ER-218 ¶¶ 77–78. Had Papanek known the Letter's representations were not accurate, he would not have purchased the Service Plan. 2-ER-218 ¶ 79.

**F.** **Appellant Steacy purchased a Service Plan through a marketing letter and, upon filing a claim, was offered only an inadequate buyout conditioned on his destruction of the appliance.**

In 2018, Steacy purchased a Whirlpool dishwasher. 2-ER-218 ¶ 80. In June 2019, his dishwasher malfunctioned and Whirlpool agreed to cover the repair even though the manufacturer's warranty had ended. 2-ER-218–219 ¶¶ 81–82. Sometime between July 2019 and July 2020, Steacy received a marketing letter making representations similar to the letter Papanek received. 2-ER-219 ¶ 83.[6] In reliance on those representations, Steacy purchased a Service Plan. 2-ER-219 ¶ 87.

Around April 2021, Steacy's dishwasher malfunctioned again and he submitted a claim. 2-ER-220 ¶ 88. Defendants arranged for a third-party repair company to repair the dishwasher, but between May and August 2021, scheduled visits were repeatedly cancelled because the repair company lacked the necessary parts. 2-ER-220 ¶¶ 88–90.

On August 26, 2021, Whirlpool told Steacy it would not repair or replace his dishwasher but would instead buy it out for a cash settlement

---

[6] The district court considered Papanek's letter to be representative of Steacy's letter (1-ER-8 n.4), so Appellants treat the letters as the same for purposes of this appeal.

less than the original purchase price. 2-ER-220 ¶ 92. To receive the settlement, Steacy was required to sign a proof-of-destruction affidavit agreeing to destroy his appliance, render it unusable, and dispose of it in accordance with applicable regulations. 2-ER-220 ¶ 93; 2-ER-263. Defendants made this decision unilaterally, over Steacy's objections. 2-ER-221 ¶¶ 95–96.

Not wanting to risk losing the cash settlement, Steacy submitted the proof-of-destruction affidavit around September 15, 2021, and Defendants stopped providing services under his Service Plan. 2-ER-221–222 ¶¶ 98–99. Had Steacy known the representations he relied on were not accurate, he would not have purchased the Service Plan. 2-ER-222 ¶ 100.

## G. The district court dismisses the original complaint with leave to amend, and Appellants file a Second Amended Complaint.

On August 3, 2023, Salas filed the original complaint challenging Defendants' deceptive advertising of the Service Plans. 3-ER-383–462. The district court granted Defendants' motions to dismiss and provided Salas leave to amend. 3-ER-357–382. Salas filed a first amended complaint, and while Defendants' motions to dismiss that complaint were

pending, the court granted Salas's unopposed motion to further amend. 3-ER-300–356; 2-ER-297–298.

On June 27, 2024, Salas, now joined by Papanek and Steacy, filed the Second Amended Complaint. 2-ER-199–296. As relevant here, Appellants raised claims under California's CLRA, Cal. Civ. Code §§ 1750, *et seq.*, FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, and UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq*. 2-ER-239–245; 2-ER-252–255.

## H. The district court dismisses the Second Amended Complaint and denies further leave to amend.

Defendants moved to dismiss the Second Amended Complaint, Appellants opposed, and the district court held a hearing on April 11, 2025. 1-ER-42–87. On October 30, 2025, the district court granted the motions, denied leave to amend, and dismissed the Second Amended Complaint with prejudice. 1-ER-3–41.

The district court rejected two arguments raised in support of dismissal. The court held Appellants *had* statutory standing for their CLRA, FAL, and UCL claims. 1-ER-13–15. The court reasoned Appellants alleged a viable theory of economic harm and causation: they purchased the Service Plans based on specific misrepresentations, the Service Plans provided inferior service or differed from what was

advertised, and they would not have purchased or paid as much absent those misrepresentations. *Id.* The court also found the CLRA, FAL, and UCL claims were alleged with sufficient particularity under Federal Rule of Civil Procedure 9(b). *Id.*

The court nonetheless dismissed the CLRA, FAL, and UCL claims on two independent grounds. First, the court held the marketing materials were not deceptive because the qualifiers directed consumers to the Service Contract, a reasonable consumer would be expected to consult the Service Contract, and the Service Contract disclosed the terms that Appellants alleged were misrepresented or omitted. 1-ER-20–26. Second, the court held the marketing materials did not misrepresent the Service Contract's terms. 1-ER-26–28.

Additionally, the court held Appellants lacked standing to pursue their UCL claims because they lacked Article III standing to seek injunctive relief and did not seek restitution, the only other remedy available under the UCL. 1-ER-32–34. The court also found the UCL claims failed on the merits under each prong for reasons overlapping with its CLRA and FAL analysis. 1-ER-35–38.

21

The court denied leave to amend, finding amendment would be futile given Appellants' previous attempts to plead their claims. 1-ER-40–41. For these reasons and others that are not the subject of this appeal, the court dismissed the Second Amended Complaint with prejudice. *Id.* The court entered judgment in favor of Defendants on November 12, 2025. 1-ER-2.

## I.   Appellants timely appeal.

On December 11, 2025, Appellants timely appealed. 3-ER-463.

## STANDARD OF REVIEW

A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is reviewed *de novo. Malheur Forest Fairness Coal. v. Iron Triangle, Ltd. Liab. Co.*, 164 F.4th 710, 723 (9th Cir. 2026). In so reviewing, courts "accept as true Plaintiffs' nonconclusory factual allegations, construe all reasonable inference[s] in favor of Plaintiffs, and ask whether the facts are sufficient to state a claim to relief that is plausible on its face." *Id.* (quoting *Dowers v. Nationstar Mortg., LLC*, 852 F.3d 964, 969 (9th Cir. 2017) (alteration in original)).

A district court's denial of leave to amend is reviewed for abuse of discretion, "but the question of futility of amendment is reviewed *de novo*." *Malheur Forest*, 164 F.4th at 723.

## SUMMARY OF THE ARGUMENT

The district court's dismissal of Appellants' CLRA, FAL, and UCL claims should be reversed.

*First*, the district court erred in dismissing those claims for failure to state a claim. Appellants plausibly alleged a reasonable consumer would read the Letter and Webpage to promise repair-or-replacement coverage comparable to the manufacturer's warranty for the full term of the Service Plan. Instead, the Service Plan allowed Defendants to resolve claims through a buyout: a depreciated cash settlement that terminated all remaining coverage on the plan and required consumers to attest they had destroyed the appliance. Defendants could invoke the buyout in their sole discretion, even if the appliance could be repaired. The court reached the opposite conclusion only by adopting flawed legal premises and by improperly resolving the fact-intensive reasonable consumer inquiry on the pleadings as a matter of law.

The court first erred by categorically requiring reasonable consumers to consult the Service Contract when viewing the advertisement, imposing a duty California law does not recognize. Consumers are entitled to rely on an advertiser's representations and are not required to look beyond misleading representations to discover the truth elsewhere. The court further erred by concluding that the mere availability of the Service Contract cured the deception. This Court and California courts have repeatedly held that misleading advertising remains actionable even when consumers later receive, or could have accessed, documents containing the actual terms.

The district court also erred by treating this case as one of the rare circumstances in which no reasonable consumer could be misled as a matter of law. Appellants plausibly alleged that both the Letter and the Webpage misled consumers about the nature and duration of the Service Plan's coverage. The Letter presents the Plan as offering repair-or-replacement coverage comparable to the manufacturer's warranty through its branding and its promise of no out-of-pocket expenses for covered repairs and replacements and 100% parts and labor for covered repairs. The fine-print, generic qualifier toward the bottom of the Letter

24

fails to adequately disclose that Defendants may instead exercise a buyout that terminates coverage or put reasonable consumers on notice about the need to follow the link to the Service Contract to discover any such limitation. The Webpage conveys the same repair-or-replacement message through its branding, coverage descriptions, warranty-extension visuals, and repair-cost comparisons. Neither the superscript qualifier attached to "If We Can't Fix It – We Replace It[2]" nor the generic qualifier at the bottom of the Webpage adequately discloses that Defendants may exercise a buyout by declining to repair a fixable appliance, paying only a depreciated cash settlement, and ending coverage after that payment.

The Letter's and Webpage's representations are independently actionable as affirmative misrepresentations. They also triggered a duty to disclose the buyout provision, the undisclosed payout limit that drives buyout decisions, and the proof-of-destruction requirement. Even if reasonable consumers were expected to look beyond the advertisements to the Service Contract, they still would be misled because the Service Contract does not disclose the payout limit or the proof-of-destruction requirement. At a minimum, whether reasonable consumers would be

misled by the Letter and Webpage is a factual question that should not have been resolved as a matter of law on the pleadings.

*Second*, the district court also erred by concluding Appellants lacked standing to pursue their UCL claims based on the finding that Appellants did not seek restitution. The Second Amended Complaint alleges entitlement to restitution, invokes the statutory provision authorizing restitution under the UCL, alleges overpayment injuries, and includes a prayer of relief broad enough to encompass restitution. Those allegations are sufficient to seek restitution, and the district court's contrary conclusion cannot be reconciled with the complaint's allegations or requested relief. Because Appellants adequately alleged that they seek restitution, they have standing to pursue their UCL claims.

*Third*, the district court abused its discretion by denying leave to amend. The court found amendment futile based on the prior amendment history, but that history does not support the court's conclusion. Papanek and Steacy had never previously amended and challenged a different advertisement, raising distinct factual issues the court had not previously addressed. And as for Salas, only one of his amendments

26

responded to a court order. The court identified no bad faith, undue delay, or prejudice.

For these reasons, the district court's dismissal of Appellants' CLRA, FAL, and UCL claims should be reversed. Alternatively, at a minimum, this Court should reverse the denial of leave to amend those claims and provide Appellants with an opportunity to amend upon remand.

## ARGUMENT

### I. Appellants plausibly alleged Defendants' advertising of the Service Plans violated the CLRA, FAL, and UCL, and the district court erred in concluding otherwise.

The CLRA, FAL, and UCL "prohibit not only false advertising, but also advertising that is 'either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 777 (9th Cir. 2024) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)). False advertising claims brought under these statutes "are governed by the 'reasonable consumer' standard, which requires a plaintiff to 'show that members of the public are likely to be deceived' by the defendant's marketing claims." *Id.* (quoting *Williams*, 552 F.3d at 938); *see Moore v.*

27

*Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020) (noting it is appropriate to evaluate CLRA, FAL, and UCL claims collectively where they are premised on the same misleading acts).[7] Whether "a business practice is deceptive will usually be a question of fact not appropriate for decision at the pleadings stage." *Whiteside*, 108 F.4th at 778 (quoting *Williams*, 552 F.3d at 938–939 (citation modified)). Dismissal is appropriate only in the "rare" case where "the advertisement itself makes it impossible for the plaintiff to prove that a reasonable consumer is likely to be deceived." *Whiteside*, 108 F.4th at 778 (quoting *Williams*, 552 F.3d at 938–939 (citation modified)).

This is not the "rare" case. The district court's dismissal of the CLRA, FAL, and UCL claims is contrary to clear authority from this Court and California courts. The district court improperly imposed a duty

---

[7] The district court analyzed Appellants' CLRA, FAL, and UCL claims collectively but also evaluated each UCL prong independently. 1-ER-17–28; 1-ER-34–37. The court's independent dismissal of the UCL's fraudulent and unfair prongs rested on the same reasoning as its collective analysis. 1-ER-35 n.9. The court dismissed the UCL's unlawful prong because Appellants failed to allege a predicate statutory claim, as the court found the CLRA, FAL, and Song-Beverly Act claims failed. 1-ER-35. Reversal of the CLRA and FAL claims would therefore require reversal of the UCL claim under the unlawful prong as well. This section challenges the district court's rulings on the consumer protection statutes collectively and its separate but overlapping UCL ruling.

on reasonable consumers, as a categorical matter, to consult the Service Contract when viewing the advertisement and concluded the mere availability of the Service Contract cured the deception. Building on this flawed foundation, the district court then substituted its own judgment for that of the reasonable consumer. It found, as a matter of law, that reasonable consumers would not be misled because they would have noticed and followed the qualifiers to the Service Contract. Alternatively, the court found the marketing materials did not misrepresent the Service Contract's terms. Each level of the district court's analysis was flawed and warrants reversal.

**A.** **The reasonable consumer standard does not require consumers to consult contracts, and the Service Contract's availability does not cure deceptive advertising as a matter of law.**

The district court erred in concluding that reasonable consumers are expected to consult contracts as a categorical matter and that the mere availability of the Service Contract cured the deception.

*First*, consumers are entitled to rely on an advertiser's representations. They need not look beyond misleading representations to discover the truth elsewhere. The reasonable consumer standard asks "how consumers actually behave—how they perceive advertising and

29

how they make decisions." *Salazar v. Walmart, Inc.*, 83 Cal. App. 5th 561, 567 (2022) (quoting *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 481 (7th Cir. 2020)). A reasonable consumer "need not be exceptionally acute and sophisticated, nor must they necessarily be wary or suspicious of advertising claims." *Id.* at 566 (quoting *Skinner v. Ken's Foods, Inc.*, 53 Cal. App. 5th 938, 948 (2020) (citation modified)). In *Williams*, this Court held reasonable consumers should not be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box. 552 F.3d at 939. California courts have endorsed that holding, rejecting "the assumption that reasonable consumers of vitamins are back-label scrutinizers." *Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 1174 (2018).

The district court misinterpreted *Whiteside* as modifying this principle. 1-ER-22–23. It also distinguished *Whiteside* and other product-label cases on the ground that physical products where salient qualities "can be straightforwardly stated on packaging" are distinct from service contracts, "a necessarily more complicated item whose terms cannot be presented on *packaging*." 1-ER-23 (emphasis in original). On that basis,

30

the court reasoned that consumers purchasing a service plan should be expected to consult the contract's terms. 1-ER-23–24.

*Whiteside* does not support that reasoning. It did not narrow *Williams.* It confirmed "*Williams* and *Brady* stand for the proposition that if a product's front label is plausibly misleading to reasonable customers, then the court does not consider the back label at the pleadings stage. Whether the back label ultimately defeats the plaintiff's claims is a question left to the fact-finder." *Whiteside*, 108 F.4th at 778. *Whiteside* clarified only that courts may consider a product's back label on a motion to dismiss when a front-label representation is ambiguous and a "front label is ambiguous when reasonable consumers would necessarily require more information before reasonably concluding that the label is making a particular representation." *Id.* at 781–783, 785. It did not hold that an asterisk appearing anywhere on an advertisement cures deception as a matter of law. *See id.* at 784–785. Nor did it say anything about imposing a duty on consumers to consult a separate contract. As demonstrated below, the challenged representations in the Letter and the Webpage are not ambiguous under this framework because they plausibly convey a concrete message that reasonable

31

consumers can understand without additional information. *See infra* Sections B.2, C. The district court therefore erred in considering the Service Contract in ruling on the motion to dismiss as reasonable consumers would not be expected to review the Service Contract under the circumstances.

The district court's product-versus-contract distinction also fails because the principle underlying *Williams* and *Brady* does not turn on the medium. It instead reflects California's foundational rule that consumers have a right to rely on statements made by advertisers and its consumer protection statutes are intended to "reach any novel or creative scheme of false or misleading advertising that a deceptive business may devise." *Nationwide Biweekly Admin., Inc. v. Superior Ct.*, 9 Cal. 5th 279, 308 (2020); *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 961 (9th Cir. 2018) ("California has decided that its consumers have a right, while shopping in a store selling consumer goods, to rely upon the statements made on a product's packaging."). And that principle is not confined to the product-label setting. Courts routinely apply the reasonable consumer standard to transactions involving contracts. *See, e.g.*, *Bodenburg v. Apple Inc.*, 146 F.4th 761, 769 (9th Cir. 2025) (applying

32

reasonable consumer standard to Apple's iCloud storage advertisement);[8] *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010) (applying reasonable consumer standard to credit card advertisement); *People ex rel. Gascon v. HomeAdvisor, Inc.*, 49 Cal. App. 5th 1073, 1078, 1086–1087 (2020), *as modified* (June 5, 2020) (applying reasonable consumer standard to home-services platform advertisements); *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 227 (2013) (applying reasonable consumer standard to a calling plan advertisement); *see also Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (noting "the reasonable person standard is well ensconced in the law in a variety of legal contexts in which a claim of deception is brought" (quoting *Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1398 (E.D. Cal. 1994)).

---

[8] In *Bodenburg*, this Court characterized *Whiteside*'s front-label/back-label principle as "specific to product labeling," but acknowledged that *Whiteside* "raises a larger question whether a company may use accurate statements to correct an initial deceptive statement" and "may be relevant to certain consumer protection claims." 146 F.4th at 770 n.3. The Court found *Whiteside* of limited relevance there because the challenged advertisement contained no deceptive statements. *Id.* Here, by contrast, Appellants plausibly alleged the marketing materials would deceive reasonable consumers. And notably, even though the Court characterized *Whiteside*'s framework as product-specific, it nonetheless applied this Court's product-label reasonable consumer precedent in evaluating Apple's advertisement. *See id.* at 769.

Appellants do not contend that every salient term of a service contract must be in an advertisement. Moreover, any difference between service contracts and product labels cuts against the district court's reasoning. A consumer can flip a product over to read the back label. Here, the consumer must locate, open, and parse a separate document rife with dense legalese. If reasonable consumers are not expected to be "back-label scrutinizers," *Brady*, 26 Cal. App. 5th at 1174, they are even less likely to scrutinize a prolix Service Contract.

The district court's approach would effectively immunize any advertiser that includes a generic reference to "terms and conditions" in its marketing materials. Under that framework, no representation could be misleading because the advertiser could always point consumers to the fine print. That is not the law. "*Williams* stands for the proposition that if the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 966 (9th Cir. 2016). And in *FTC v. Cyberspace.Com LLC*, this Court held a "solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." 453 F.3d 1196, 1200–1201

34

(9th Cir. 2006) (holding fine-print disclosures on the back of a check, invoice, and advertising insert did not cure the deceptive impression created by the fronts of those documents).[9]

*Second*, false advertising claims remain actionable even when the consumer receives or has an opportunity to view the document containing the actual terms. In *Chern v. Bank of America*, the California Supreme Court held a bank's practice of initially quoting an inaccurate interest rate could mislead reasonable consumers even though the bank ultimately disclosed the actual rate, because the initially misleading representation may unfairly entice consumers to commence the transaction. 15 Cal. 3d 866, 876 (1976). Similarly, in *Chapman*, the court held defendant's ultimate disclosure of the limits on its calling plan did not excuse its practice of labeling the plan "Unlimited" in its initial dealings with potential customers. 220 Cal. App. 4th at 228.

---

[9] Although this case arose under the Federal Trade Commission Act, California courts have recognized that interpretations of the FTC Act have persuasive force in applying the reasonable consumer standard under California's consumer protection statutes. *See Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506 (2003) ("Because of this relationship between the [UCL] and the Federal Trade Commission Act, judicial interpretations of the federal act have persuasive force." (alteration in original)).

35

This Court applied the same principle in *Rubio*, holding a reasonable consumer was likely to be deceived by advertisements of a "fixed" APR that enticed plaintiff to enter into a credit card agreement whose terms allowed the APR to change. 613 F.3d at 1198, 1204; *see also Resort Car Rental Sys., Inc. v. F.T.C.*, 518 F.2d 962, 964 (9th Cir. 1975) (per curiam) ("The Federal Trade Act is violated if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."). Relying on *Rubio*, the district court in *DotStrategy Co. v. Twitter Inc.* rejected the argument that extra-contractual misrepresentations can never give rise to a false advertising claim when corrected by contractual disclaimers. 476 F. Supp. 3d 978, 985 (N.D. Cal. 2020). The court noted the question is "not whether [defendant's] contractual terms corrected the false statements in its advertising, but whether [plaintiff's] reliance on the false advertising was reasonable even in light of the contractual disclaimers." *Id.* (alteration added).

The district court's holding that disclosure of the Service Contract defeated Appellants' claims as a matter of law cannot be reconciled with these authorities. Whether the qualifiers would have put reasonable

36

consumers on notice to consult the Service Contract, and whether its terms would have dispelled any misperceptions, are questions of fact. Not categorical defenses that can defeat false advertising claims as a matter of law on the pleadings.

**B. The Letter misleads reasonable consumers about the nature and duration of the Service Plan's coverage.**

The Letter conveys a clear message: the Service Plan provides repair-or-replacement coverage comparable to the manufacturer's warranty for the duration of the plan's term at no additional cost. That message is misleading because what it provides is much different—Defendants may exercise a buyout based on an undisclosed payout limit and conditioned on the consumer's destruction of the appliance. The fine-print, generic qualifier toward the bottom of the Letter does not cure this deception. The district court's contrary conclusion is not supported by the record or how the reasonable consumer standard is intended to operate.

**1. The Letter misleads reasonable consumers into believing the Service Plan offers repair-or-replacement coverage comparable to the manufacturer's warranty for the full term of the plan.**

The Letter advertises the Service Plan as providing "**No Service Fee:** No out-of-pocket expenses on covered repairs and replacements,"

37

and "**Valuable Protection:** 100% parts and labor for covered repairs, where applicable." 2-ER-197 (emphasis in original). It also offers the Service Plan for a fixed term of one, two, or three years, with a 50 percent discount on the three-year plan. *Id.* Together, those representations convey that the Service Plan provides repair-or-replacement coverage for the plan's term at no additional cost.

The branding reinforces that impression. The Letter appears on KitchenAid letterhead, labels the plan a "KitchenAid Service Plan," is signed by a "KitchenAid Service Plan Team" member, and advertises one of its benefits as "Service by KitchenAid." 2-ER-197 (emphasis omitted). Its second sentence tells consumers: "Remember, no one is more committed to bringing you the quality of service you'd expect than KitchenAid!" *Id.* Those representations tie the Service Plan to KitchenAid and the level of protection consumers associate with a manufacturer's warranty, reinforcing the reasonable interpretation that the plan provides comparable coverage.

The district court nevertheless concluded that the Letter did not misrepresent any terms of the Service Contract. 1-ER-26–28. However, the court's analysis asked the wrong question. The issue is not whether

38

the Letter's representations can be reconciled with the Service Contract through some narrowing interpretation. It is whether the Letter would mislead reasonable consumers into believing they would receive repair-or-replacement coverage comparable to the manufacturer's warranty when the reality was materially different. California's consumer protection statutes reach statements that are "literally true, [but] nevertheless deceptive and misleading *in [their] implications.*" *Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1138 (2020) (quoting *People v. Wahl*, 39 Cal. App. 2d Supp. 771, 773 (1940) (emphasis and alterations in original); *see also Horne v. Harley-Davidson, Inc.*, 660 F. Supp. 2d 1152, 1159 (C.D. Cal. 2009) (holding that the fact plaintiffs received all that was promised under the service contract did not defeat their CLRA claim concerning defendants' prior or contemporaneous misrepresentations regarding the contract's terms). The district court's specific findings underscore the error.

*Warranty-like coverage.* The district court held the Letter did not imply the Service Plan extended, or provided the same benefits as, the manufacturer's warranty because it used different terms, "service plan" versus "warranty," and stated the Service Plan begins after the warranty

39

ends. 1-ER-26. But that analysis overlooks the strong impression created by the KitchenAid branding, which would lead consumers to expect coverage comparable to a manufacturer's warranty. Nor does the term "service plan" carry any settled meaning that would alert consumers to materially different coverage. Defendants' own usage confirms the point. In responses to consumers on social media, Defendants used "service plan," "extended warranty," and "Extended Service Plan" interchangeably. 2-ER-281–284. Defendants' Amana brand emails invited consumers to "Learn more about extended warranties" and linked directly to webpages marketing Service Plans. 2-ER-231–232 ¶ 120(d). Defendants cannot maintain that reasonable consumers would draw a meaningful distinction between coverage provided under a "service plan" and "warranty" when Defendants themselves did not. And that the plan begins after the manufacturer's warranty ends reinforces, rather than dispels, that impression. A reasonable consumer would understand the Service Plan as picking up where the warranty left off.

The district court also found that Appellants had not alleged how the Service Plan differed from the manufacturer's warranty. 1-ER-27. The record says otherwise. Appellants alleged the Service Plan is

"materially inferior" to the manufacturer's warranty because, unlike the warranty: repair-or-replacement coverage can end before the plan's term expires if Defendants exercise a buyout; the Service Contract permits Defendants to avoid repairing or replacing a covered appliance altogether; and upon a buyout, Defendants can require the consumer to surrender or destroy the appliance, foreclosing third-party repair. 2-ER-230 ¶ 119; see also 2-ER-228 ¶ 116(a). Appellants attached an exemplar manufacturer's warranty to the Second Amended Complaint that contains no buyout provision. 2-ER-293. It also allows for actual replacement—not a depreciated cash settlement—and the warranty continues for the remaining term. *Id.* Under the Service Plan, none of that is guaranteed.

The district court therefore erred in concluding that the Letter would not mislead reasonable consumers into believing the Service Plan provided warranty-like coverage.

*Duration of coverage.* The district court found the Letter did not mislead as to the Service Plan's coverage duration because it did not foreclose the possibility that a buyout could end coverage early. 1-ER-27. But the absence of an express statement that coverage would not end

41

prematurely does not make the Letter's stated term not misleading. Nothing in the Letter signals the coverage may be cut short. To the contrary, the Letter offers the plan for a specific number of years and promotes the three-year plan at a 50 percent discount, suggesting the longer plan is more valuable because it provides protection for a longer period. 2-ER-197. In reality, coverage can be terminated at any time through a buyout, and the longer the plan, the more likely a claim triggers a buyout due to the undisclosed payout limit. The district court thus erred in concluding the Letter would not mislead reasonable consumers into believing their Service Plan coverage would last for the full term they purchased.

*Repair-or-replacement coverage.* The district court further held that the Letter's representations about repair-or-replacement coverage were not misleading because it was not clear what "100% parts and labor for covered repairs, where applicable" was alleged to misrepresent and, in any event, "for covered repairs" was a built-in contingency suggesting there are circumstances when Defendants would not pay for parts and labor. 1-ER-27. The court likewise concluded "[n]o out-of-pocket expenses on covered repairs and replacements" was not irreconcilable with the

42

Service Contract and was, at worst, ambiguous and clarified by the asterisk that does not appear next to the representation. *Id.*

Setting aside the asterisk and associated generic qualifier, which are discussed below, the representations clearly convey that the Service Plan offers repair-or-replacement coverage at no additional cost. The phrase "for covered repairs" is not a built-in contingency suggesting a buyout. It speaks to which malfunctions fall within the plan's scope, not to how Defendants may resolve a covered claim. In any service or warranty plan, certain categories of failure are excluded, such as damage from misuse or unauthorized modifications. A reasonable consumer would read "for covered repairs" as distinguishing covered malfunctions from excluded ones. The phrase says nothing about remedy. So too with "where applicable." That phrase merely signals that a listed benefit may not apply in every circumstance, a commonplace qualifier that reasonable consumers would associate with scope limitations. Neither phrase alerts a reasonable consumer that the advertised repair-or-replacement coverage is subject to a provision allowing Defendants to substitute a fundamentally different remedy entirely at their own discretion.

43

A buyout is not simply an alternative resolution to repair or replacement. It is a materially different outcome. Repair or replacement leaves the consumer with a working appliance. A buyout leaves a consumer without one and instead provides a depreciated cash settlement that is insufficient to purchase a replacement appliance, while *also* requiring proof of destruction to receive even that lesser amount. 2-ER-226 ¶ 114(b)–(c); 2-ER-228–229 ¶ 116(a). The district court therefore erred in concluding these representations would not mislead consumers into believing claims submitted through the Service Plan would be resolved by repair or replacement coverage, not a buyout.

### 2. The asterisk and fine-print, generic qualifier do not cure the deception.

The district court held that the asterisk following "KitchenAid Service Plan Benefits*" and the associated fine-print, generic qualifier put Appellants on notice that the advertised coverage was subject to qualifications and caveats and directed them to the Service Contract. 1-ER-22–23. That conclusion is flawed at every step. The asterisk is not adjacent to the repair-or-replacement representations. The generic qualifier would not alert a reasonable consumer to the need to follow the link to the Service Contract to learn about a material limitation to the

44

promised repair-or-replacement coverage. The physical medium of the Letter makes it unreasonable to expect consumers to navigate online to review the Service Contract. And even were the Court to find reasonable consumers would follow the link to the Service Contract, they still would be misled.

The asterisk and generic qualifier do not render the Letter's representations ambiguous in the first place. The Letter makes concrete promises about both the nature and duration of coverage as discussed above. *See supra* Section B.1. A representation is ambiguous only when reasonable consumers would necessarily require more information before reasonably concluding that the advertisement is making a particular representation. *Whiteside*, 108 F.4th at 781. That is not the case here. A reasonable consumer would not need to consult a separate contract to understand that the Letter is promising repair-or-replacement coverage for the duration of the selected plan. *See id.* at 782–783 (holding the unasterisked "plant-based" representation was not ambiguous because reasonable consumers would not need more information to understand it as representing that the product contains no synthetic ingredients).

*The asterisk is not adjacent to the challenged representations.* Whether qualifying language cures a potentially misleading representation depends on whether the qualifier appears next to the representation it purports to qualify. In *Freeman*, this Court held no reasonable consumer would be misled because the advertisement's "qualifying language appears immediately next to the representations it qualifies and no reasonable reader could ignore it." 68 F.3d at 289. In *Kang v. P.F. Chang's China Bistro, Inc.*, 844 F. App'x 969, 972 (9th Cir. 2021), this Court found *Freeman* inapposite precisely because the purported qualifying language did not appear immediately next to the challenged representation. And in *Dinan v. Sandisk LLC*, No. 18-CV-05420-BLF, 2019 WL 2327923, at *2 (N.D. Cal. May 31, 2019), a case the district court relied on, the asterisk was next to the challenged representation and the qualifying language contained the specific information necessary to make the plaintiff's interpretation unreasonable.

Here, by contrast, the asterisk follows "KitchenAid Service Plan Benefits*"—the heading, not the specific representations Appellants challenge. The representations that there are "[n]o out-of-pocket

46

expenses on covered repairs and replacements" and "100% parts and labor for covered repairs, where applicable" are unaccompanied by any asterisk, superscript, or other indicator directing consumers to additional terms. Because the asterisk does not appear next to the repair-or-replacement representations, it would not put a reasonable consumer on notice that those specific representations are subject to caveats. *See Carvalho v. HP, Inc.*, No. 21-CV-08015-BLF, 2022 WL 2290595, at *5 (N.D. Cal. June 24, 2022) (noting "the fact that a consumer could only learn that the strikethrough price is a MSRP upon reading the fine print at the bottom of the webpage and then clicking on the '+' suggests that a reasonable consumer could justifiably be unaware of that disclaimer").

*Whiteside* confirms the Letter's qualifier is insufficient. The district court relied on *Whiteside*'s Asterisked Products holding for the proposition that the presence of an asterisk alone puts a consumer on notice. 1-ER-23. But *Whiteside* involved a qualifier that satisfied both proximity and specificity: the asterisk appeared immediately next to the challenged representation ("plant-based wipes*"), and the qualifier was specific ("*70%+ by weight"), directly addressing the consumer's potential misunderstanding. 108 F.4th at 775–776, 785. The Letter's qualifier fails

47

on both counts. The asterisk is not next to the challenged representations, and the qualifier does not specifically address the misleading representations. The district court therefore erred in concluding that reasonable consumers would believe the asterisk qualified the repair-or-replacement representations and would have looked to the associated language for caveats or limits to those representations.

*Even if the qualifier were considered, it would not alert a reasonable consumer to the need to follow the link to the Service Contract.* Even were the Court to find reasonable consumers would notice the asterisk after "KitchenAid Service Plan Benefits*" and follow it to the fine-print text, the qualifier would not alert reasonable consumers that the repair-or-replacement coverage is subject to material limitations and they needed to follow the link to the Service Contract to discover those limitations. The qualifier reads: "Limitations and exclusions apply. See the complete terms and conditions at serviceplans.kitchenaid.com/details." 2-ER-197. This phrase is buried in a block of fine-print legalese identifying AIGWG as the plan issuer, providing its corporate address, and disclaiming any affiliation with KitchenAid—none of which relates to the buyout

48

limitation. *Id.* Whether a reasonable consumer would read past this boilerplate to reach the qualifier is doubtful. *See Freeman*, 68 F.3d at 289 (finding it significant that qualifying language was neither hidden nor unreasonably small when holding it cured any chance of deception); *see also Floersheim v. FTC*, 411 F.2d 874, 877 (9th Cir. 1969) (upholding FTC's finding that an "inconspicuous disclaimer" did not dispel the misleading impression created by the forms' overall presentation where recipients were "unlikely to notice respondent's inconspicuous disclaimer or to understand its import").

Even a consumer who reached the qualifying phrase would not understand it to introduce ambiguity into the promised coverage. Even the manufacturer's warranty excludes problems arising from misuse or unauthorized modifications. *See* 2-ER-293. A reasonable consumer encountering this generic phrase would understand it to refer to customary carve-outs of that kind, not to a provision allowing Defendants to exercise a buyout. The phrase signals the existence of boundaries around coverage. It does not signal that the coverage itself can be bought out and terminated. Nor does it suggest that consumers must consult a separate contract to determine what kind of coverage is being offered.

49

Consumers would understand the Letter to promise repair-or-replacement coverage for the plan's term, subject to ordinary exclusions, not to reserve Defendants the right to buy out a claim, terminate coverage, and require proof of destruction. *See, e.g.*, *Anthony v. Pharmavite*, No. 18-CV-02636-EMC, 2019 WL 109446, at *4 (N.D. Cal. Jan. 4, 2019) (holding that even assuming a reasonable consumer would follow the asterisk, it cannot be concluded as a matter of law that the substance of the disclaimer would be sufficient to disabuse the consumer of any misconceptions engendered by the challenged representations).

*Chapman* is instructive. There, a superscript appeared immediately after the word "Unlimited" in the calling plan title and referenced a link stating "*A fair usage policy* applies." 220 Cal. App. 4th at 223 (emphasis in original). Despite the superscript's proximity, the court held it was a question of fact whether a reasonable consumer would follow the link and discover the plan's limits. *Id.* at 227. The court reasoned that the phrase "fair usage policy" suggested "a policy to protect against misuse of the service provided," not that the plan was actually limited. *Id.* The qualifier here is weaker than the one in *Chapman*. "Limitations and exclusions apply" is more generic than "a fair usage

50

policy." It is not adjacent to the challenged representations, whereas the *Chapman* superscript was. And it is buried in boilerplate, whereas the *Chapman* qualifier was a standalone reference. If the qualifier in *Chapman* did not cure the deception as a matter of law, the qualifier here cannot do so either.

*Prata v. Superior Court* is also instructive. 91 Cal. App. 4th 1128, 1132–1133 (2001). There, a bank advertised a credit program as "Same-As-Cash" and some of the advertisements directed consumers to "ask for details" and the detailed provisions of the transaction were in program documents given or available to consumers. *Id.* In fact, the program required minimum monthly payments during the promotional period, a material term not disclosed in the advertisement. *Id.* The court held the advertisement was likely to deceive because consumers would understand "Same-As-Cash" to mean no payments were required during the promotional period. *Id.* at 1145. The court also held that the "fact that disclosures and the credit agreement issued by Bank One stating the 'details' of the program may have explained that the program was, in fact, not as advertised, does not ameliorate the deceptive nature of this advertising." *Id.*

51

The same reasoning applies here. Defendants advertised repair-or-replacement coverage and directed consumers to "See the complete terms and conditions," the functional equivalent of "ask for details." That the Service Contract may explain the buyout provision does not ameliorate the deception any more than the credit agreement in *Prata* did. As *Whiteside* recognized, "a back label that does not *confirm* what was on the front label cannot defeat a pleading stage challenge to the plaintiff's UCL, CLRA, false advertising and warranty claims." 108 F.4th at 778 (quoting *Brady*, 26 Cal. App. 5th at 1168 (citation modified; emphasis in original)). The Service Contract does not confirm the Letter's promise of repair-or-replacement coverage. It contradicts it by authorizing Defendants to exercise a buyout instead of providing repair or replacement coverage. *See Rubio,* 613 F.3d at 1202–1203 ((holding a statement that "[m]y Agreement terms (for example, rates and fees) are subject to change" on the same page as a "fixed" APR solicitation did not cure the deception because a reasonable consumer would not understand it to contradict the specific representations on the page about when the APR may change).

52

The Federal Trade Commission has disapproved of generic disclaimers for precisely this reason. In a recent enforcement action, the FTC found hyperlinks inviting consumers to "click here to see TurboTax product guarantees, disclaimers and other important information" were inadequate because they did not give consumers sufficient reason to click them. *In the Matter of Intuit Inc.*, 2024 WL 382358, at \*68 n.33. In reaching that conclusion, the FTC cited to prior guidance that generic hyperlinks that "simply say 'disclaimer,' 'more information,' 'details,' 'terms and conditions,' or 'fine print' do not convey the importance, nature, and relevance of the information to which they lead and are likely to be inadequate." *Id.* (quoting FTC, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* (Mar. 2013));[10] *see also FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1080 (11th Cir. 2021) (holding disclosures were not "sufficient to disabuse consumers of" the impression that a website would provide certain services when they were "either too small or too vague to dispel the misrepresentations otherwise

---

[10] The district court declined to take judicial notice of the FTC's *.com Disclosure* guidance. 2-ER-91–144; 1-ER-11 n.5. Appellants cite the guidance here because the FTC relied on it in *Intuit*, and its reasoning is consistent with the cases discussed herein.

created by the websites"); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression.").

The district court therefore erred concluding reasonable consumers would be on notice of a material limitation to the repair-or-replacement coverage such that they would understand they needed to follow the link to the Service Contract. Because the Letter's representations are not ambiguous, reasonable consumers had no reason to consult the Service Contract in the first place.

*The physical medium of the Letter undermines any conclusion that reasonable consumers would follow the link to the Service Contract*. The Letter is not a webpage. A consumer cannot click through to the Service Contract. And a consumer can purchase the Service Plan without ever going online. 2-ER-197. It is unreasonable to expect a consumer to separately navigate to a URL, locate the applicable terms, and determine whether the benefits Defendants promised are subject to a buyout provision—all before purchasing a plan that can be bought by returning

54

a coupon. *See Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 532 (N.D. Cal. 2018) ("It would not be reasonable to expect a consumer to search for disclaimers on a website to clarify a purported misrepresentation on in-store signage."); *Sperling v. Stein Mart, Inc.*, No. CV-15-01411 BRO(KKk), 2016 WL 11265686, at *5 (C.D. Cal. Mar. 15, 2016) (holding it would be error to expect reasonable consumers to look beyond the challenged representations to find qualifying language online or on in-store signs, even though the defendant included an asterisk). The physical medium of the Letter thus undermines the district court's conclusion that reasonable consumers would follow the link to discover the buyout provision in the Service Contract.

*Even were the Court to find a reasonable consumer would follow the link to the Service Contract, the consumer still would be misled.* The Service Contract omits two material terms that contribute to the deception: the payout limit that drives buyout decisions,[11] and the proof-

---

[11] The payout limit is distinct from the depreciation schedule in the Service Contract, which tells the consumer how much they would receive upon a buyout. 2-ER-287 ¶ 14. The payout limit determined when Defendants would exercise a buyout instead of paying for a repair—a separate, internal dollar threshold known to third-party repair contractors but not to consumers. 2-ER-227 ¶ 115(b). The district court

of-destruction requirement. As discussed below, both terms are material (*see infra* Section D), and neither is disclosed in the Service Contract. Without disclosure of the payout limit, reasonable consumers would not understand the practical reality that Defendants are unlikely to attempt repair when doing so is unprofitable. And because the Service Contract does not disclose the proof-of-destruction requirement, consumers would not understand that, even after a buyout, they may have to incur additional costs to destroy the appliance and would lose the possibility of third-party repair.

At this stage, the question is whether Appellants plausibly alleged that a reasonable consumer viewing the Letter would understand it to offer repair-or-replacement coverage for the duration of the Service Plan, without a buyout provision. They did. The fine-print, generic qualifier buried in legalese toward the bottom of the Letter does not cure the deception. The district court erred in concluding otherwise as a matter of law.

––––––––––––––––––––

appears to have conflated the two, finding the Service Contract "fully explains the payout limits." 1-ER-37.

**C.** **The Webpage similarly misleads reasonable consumers about the nature and duration of coverage, and the qualifiers do not cure the deception.**

Like the Letter, the Webpage contains affirmative representations that would likely mislead reasonable consumers about the nature and duration of the Service Plan's coverage. Its visual elements reinforce the misleading impression that the Service Plan provides the same type of coverage as the manufacturer's warranty. Neither the superscript qualifier associated with the "If We Can't Fix It – We Replace It[2]" representation nor the fine-print, generic qualifier at the bottom of the Webpage cures that deception.

**1.** **The Webpage misleads reasonable consumers into believing the Service Plan offers repair-or-replacement coverage comparable to the manufacturer's warranty for full term of the plan, and the superscript qualifier does not cure the deception.**

The Webpage advertises the Service Plan under the Whirlpool brand and highlights "Top 5 Coverage Features": "No Deductible"; "100% Factory Certified Parts and Technicians"; "Only Pre-Qualified Technicians"; "U.S. Based Customer Care Center"; and "If We Can't Fix It – We Replace It[2]." 2-ER-157. Like the Letter, the Whirlpool branding and these representations convey that the Service Plan provides repair-

57

or-replacement coverage. The district court concluded otherwise, relying primarily on the superscript 2 qualifier associated with the "If We Can't Fix It" phrase. 1-ER-20–21; 1-ER-27–28. But the superscript does not cure the deception, and the Webpage's remaining representations, none of which are qualified, independently convey the same message.

The phrase "If We Can't Fix It – We Replace It$^2$" is followed by a superscript directing consumers to language stating: "A replacement may be of like kind and quality, or in the form of a reimbursement based on the product's original price and age. See the complete <u>terms and conditions</u> for details." 2-ER-157. The phrase "<u>terms and conditions</u>" was a hyperlink to the Service Contract. 1-ER-20. The district court found this qualifier resolved any ambiguity in the phrase. 1-ER-28. Appellants dispute the district court's interpretation of the phrase. But even under the district court's own logic, if the superscript qualifier resolved any ambiguity, a reasonable consumer would have no need to follow the link to the Service Contract to learn more. *See Whiteside*, 108 F.4th at 781–783 (a back label may be considered on a motion to dismiss only when the front label is ambiguous).

58

The district court's interpretation of the superscript qualifier as disclosing the buyout provision overlooks the conditional nature of the representation. Read together, the representation and qualifier communicate: we will try to fix your appliance; if we cannot, we will replace it or reimburse you based on the product's original price and age. The conditional "if" matters. It tells consumers that Defendants will attempt to fix the appliance and will replace or reimburse only if repair is not possible. The qualifier addresses the form that a replacement might take, whether a new product or reimbursement. It does not disclose that Defendants may decline to repair a fixable appliance, that the decision whether to exercise a buyout is based on an undisclosed payout limit, that a buyout terminates all remaining coverage, or that the consumer must destroy the appliance to receive payment. The qualifier tells the consumer what they might receive if repair fails. It does not tell the consumer that Defendants may choose not to repair at all.

The direction to "See the complete <u>terms and conditions</u> for details" does not change the analysis. As discussed above, generic directions to consult the full terms do not put reasonable consumers on notice of specific, material limitations. *See supra* Section B.2. "See the complete

terms and conditions for details" is no more informative than the "fair usage policy applies" in *Chapman,* 220 Cal. App. 4th at 223, 227, or "ask for details" in *Prata,* 91 Cal. App. 4th at 1133, 1145. Reasonable consumers encountering this direction would have no reason to suspect that the terms and conditions contains a provision allowing Defendants, at their sole discretion and regardless of repairability, to pay a depreciated cash settlement rather than repairing the appliance. Even if a reasonable consumer were expected to follow the link to the Service Contract, the deception would persist because the Service Contract itself omits material terms. *See supra* Section B.2.

Further, the "If We Can't Fix It" representation is only part of the Webpage. The remaining representations, which are not qualified by superscript 2, independently convey that the Service Plan provides repair-or-replacement coverage for the plan's term. The Webpage displays a bar graph that visually depicts the Service Plan as a continuation of the manufacturer's warranty. 2-ER-157. The contiguous bars suggest uninterrupted coverage of the same kind, and "Additional Years of Whirlpool Quality Coverage" suggests coverage will be of the same quality as the manufacturer's warranty.

60

The cost-comparison chart also reinforces the same repair-centered message by comparing the "Cost of Repair Without a Plan"[12] to the "Average 1-Year Service Plan Price" for specific appliance components. 2-ER-157. The chart's premise is that the Service Plan saves consumers money on repairs, with no reference to a buyout or any resolution other than repair. A separate Whirlpool page reinforces this impression through an infographic stating: "Add a 3-year plan to your 1-year warranty for a total of 4 years of coverage." 2-ER-213. By presenting the Service Plan and the manufacturer's warranty as one continuous period of coverage, Defendants reinforced the expectation that the Service Plan provides the same type of coverage during the additional term.

Below the bar graph, the Webpage states: "A Whirlpool Service Plan provides reliable coverage, with 100% certified parts and technicians, over the lifetime of your product. Act now to stay covered beyond the limited manufacturer's warranty period." 2-ER-157. "100% certified parts and technicians" reinforces the repair framing. And "over

---

[12] Although "Cost of Repair Without a Plan" in the chart was qualified by a superscript, the associated language did not hint at the buyout. 2-ER-157. It qualified the pricing listed for repairs noting that actual incidents and repair costs may vary. *Id.*

61

the lifetime of your product" reinforces the duration representation by suggesting coverage continues as long as the consumer owns the appliance, with no indication a buyout could terminate it early.

The association with the manufacturer's warranty matters because it shapes how reasonable consumers would expect claims to be resolved. Consumers understand a manufacturer's warranty to cover all failures arising from the intended use of the appliance during the warranty period. 2-ER-201 ¶ 8 and n.1. Under a manufacturer's warranty, a consumer who submits a claim is made whole through repair or replacement. 2-ER-241 ¶ 138; 2-ER-293. The district court's conclusion that the Webpage's representations did not imply the Service Plan provided the same benefits as the manufacturer's warranty is no more persuasive as to the Webpage than it is as to the Letter. *See supra* Section B.1. A consumer may understand that the Service Plan is a different product without understanding that it provides materially different coverage. The bar graph, cost comparison chart, and unqualified representations all convey repair-or-replacement coverage comparable to the manufacturer's warranty, and superscript 2 qualifier does not dispel that impression.

62

## 2. The fine-print, generic qualifier at the bottom of the Webpage does not cure the deception.

At the bottom of the Webpage appears language substantively similar to the Letter's fine-print, generic qualifier: "Service Plans are offered, sold and issued by AIG WarrantyGuard, Inc. 650 Missouri Avenue, Jeffersonville, IN 47130, an affiliate of American International Group, Inc. (AIG). Limitations and exclusions apply. See the complete terms and conditions. Whirlpool is not affiliated with AIG or any of its affiliates. Whirlpool trademarks used with permission." 2-ER-157. Unlike the Letter, this language is not tied to any asterisk or superscript on the Webpage. There is nothing drawing a reasonable consumer's attention to it.

The qualifier's placement is also significant. It appears well below the "Get Started" button, the Webpage's call to action. A reasonable consumer navigating the Webpage would view the coverage features, review the bar graph and cost comparison chart, and click "Get Started" to purchase the plan. The qualifier falls outside this path. Although deceptive advertising and contract formation are distinct inquiries, this Court's conspicuousness analysis in determining whether a webpage provides conspicuous notice of contract terms is instructive. In *Chabolla*

63

*v. Classpass Inc.*, this Court held that conspicuousness of notice is informed by whether the notice falls within the "natural flow" of action items on the webpage. 129 F.4th 1147, 1157 (9th Cir. 2025). Here, the qualifier is positioned below the "Get Started" button and outside the natural flow of the Webpage. A reasonable consumer would have no reason to scroll past the "Get Started" button to read it.

Even if a reasonable consumer noticed the generic qualifier at the bottom of the Webpage, the qualifier still would not signal the need to follow the link to the Service Contract to discover the buyout. *See supra* Section B.2. Like the Letter's qualifier, it is generic boilerplate suggesting only ordinary limitations and exclusions, not that Defendants may refuse to repair a fixable appliance, buy out the claim, terminate coverage, and require proof of destruction. And even if the consumer followed the link, the deception would persist for the same reason discussed above: the Service Contract does not disclose the payout limit or the proof-of-destruction requirement. *See id.*

Like the Letter, as this stage, the question is whether Appellants plausibly alleged that a reasonable consumer viewing the Webpage would understand it to offer repair-or-replacement coverage for the

duration of the Service Plan, without a buyout provision. They did. Neither the superscript qualifier nor the fine-print, generic qualifier at the bottom of the Webpage would disabuse a reasonable consumer of the belief that, under the Service Plan, Defendants will repair the appliance and only if they cannot repair it will they provide a replacement or reimbursement. Nor would either qualifier alert a reasonable consumer that Defendants exercise the buyout based on an undisclosed payout limit driven by profitability analysis and require consumers to attest to destroying the appliance. The district court erred in concluding otherwise as a matter of law.

> **D. The representations in the Letter and Webpage triggered a duty to disclose the buyout provision, the undisclosed payout limit that drives buyout decisions, and the proof-of-destruction requirement.**

"A failure to disclose a fact can constitute actionable fraud or deceit . . . when the defendant makes partial representations that are misleading because some other material fact has not been disclosed." *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 862 (9th Cir. 2018) (quoting *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (2011), *as modified* (Dec. 28, 2011)). A fact is deemed material where a "reasonable consumer would deem it important in determining how to act in the transaction at

issue." *Id.* (quoting *Collins*, 202 Cal. App. 4th at 256). "Materiality is judged from the perspective of a reasonable consumer, and it is generally a question of fact." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015) (citation modified; citations omitted). The "entire theory of a case based on partial omissions is that what is disclosed is in some sense true but that the whole truth is missing." *Anderson v. Apple, Inc.*, 500 F. Supp. 3d 993, 1013 (N.D. Cal. 2020).

This is exactly what Appellants alleged here. The Letter and Webpage represent the Service Plan as providing repair-or-replacement coverage comparable to the manufacturer's warranty. *See supra* Sections B, C. Those representations are true only in a limited sense. Defendants do sometimes repair or replace covered appliances. But the whole truth is missing. The Letter and Webpage omit three material features of the coverage Defendants actually provide: the buyout provision, the undisclosed payout limit that drives buyout decisions, and the proof-of-destruction requirement. Because those omitted facts fundamentally qualify the promised repair-or-replacement coverage, Defendants had a duty to disclose them. The buyout provision is material because it goes to the heart of what the Service Plan provides. Rather than furnishing the

66

advertised repair-or-replacement coverage, Defendants may exercise a buyout. A reasonable consumer would find that limitation important in deciding whether to purchase the Service Plan and how much to pay for it.

The undisclosed payout limit is likewise material because it reveals how Defendants actually administer the buyout option. The Service Contract states only that Defendants may exercise a buyout at their sole discretion. A reasonable consumer reading that language alongside the marketing materials would still understand the buyout as something Defendants might invoke when an appliance cannot be repaired. But that is not how Defendants use it. Defendants exercise a buyout whenever the estimated repair cost exceeds an undisclosed payout limit driven by profitability, even when the appliance can be repaired. 2-ER-227 ¶ 115(b)–(c). The payout limit is not disclosed in the marketing materials, the Service Contract, or any other consumer-facing document. 2-ER-227 ¶ 115(b). That omission is material because it conceals the practical reality that Defendants are unlikely to attempt repair when doing so is unprofitable. A reasonable consumer would find that information important in deciding whether the Service Plan is worth its price.

67

The proof-of-destruction requirement is also material. To receive a cash settlement after a buyout, Defendants require the consumer to sign a proof-of-destruction affidavit agreeing to destroy or scrap the appliance at the consumer's expense. 2-ER-228–229 ¶ 116(a)–(b). The Service Contract does not disclose that requirement. 2-ER-229 ¶ 116(b). If the consumer refuses to sign the affidavit, Defendants refuse to pay the cash settlement. 2-ER-229 ¶ 116(d). A reasonable consumer would deem that condition important. Rather than merely substituting cash for repair or replacement, a buyout forecloses the possibility of third-party repair and imposes additional costs on the consumer.

The district court concluded the Service Contract encompassed this requirement because it states that, upon a buyout, the appliance becomes Defendants' property and Defendants may require the product to be returned to Defendants or their designee at Defendants' expense. 1-ER-25; 2-ER-287. That reading does not hold. Requiring a consumer to return the appliance at Defendants' expense is materially different from requiring the consumer to destroy the appliance at the consumer's expense as a condition of payment. That the payout limit and proof-of-destruction requirement were omitted not only from the Letter and

68

Webpage, but also from the Service Contract itself underscores the deception. Even if the Court were to find reasonable consumers would follow the link to the Service Contract (they would not), they would *still* not learn critical facts about how Defendants administer buyouts.

Appellants do not contend that every term of a service contract must appear in an advertisement. Their point is narrower and more straightforward. Once Defendants chose to advertise the Service Plan as providing repair-or-replacement coverage comparable to the manufacturer's warranty, they had a duty to disclose the contrary features that materially qualified that promise. The district court erred in concluding otherwise.

Appellants plausibly alleged that Defendants advertised repair-or-replacement coverage comparable to the manufacturer's warranty while omitting and obscuring contrary limitations that materially changed the nature and duration of that coverage. The district court's contrary conclusions rested on legal errors and fact finding that cannot be resolved on the pleadings. Dismissal of Appellants' CLRA, FAL, and UCL claims should be reversed.

**II.    The district court erroneously found Appellants did not seek restitution under the UCL when their allegations and prayer for relief establish otherwise.**

For private plaintiffs, the UCL limits the remedies available to restitution and injunctive relief. *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 452 (2005). In this context, restitution means compelling a defendant to return money or property, including funds in which the plaintiff had a vested interest, to the persons from whom it was taken. *Madrid*, 130 Cal. App. 4th at 453. The district court held Appellants lacked standing to pursue their UCL claims because they lacked standing to seek injunctive relief and did not seek restitution. 1-ER-34. Appellants challenge the district court's finding that they did not seek restitution. Their pleadings establish otherwise.

The Second Amended Complaint seeks restitution in multiple ways. The FAL count, which the UCL count incorporates by reference, alleges entitlement to restitution. 2-ER-245 ¶ 151; 2-ER-252 ¶ 182. The UCL count itself invokes California Business and Professions Code section 17203, which authorizes restitution. 2-ER-252 ¶ 184. And Appellants' general prayer for relief requests "appropriate monetary relief, including damages and punitive damages." 2-ER-258. The word "including" signals

70

that the list is illustrative, not exhaustive, and "appropriate monetary relief" is broad enough to encompass restitution.

Appellants' substantive allegations confirm the point. Throughout the Second Amended Complaint, Appellants allege Defendants' deceptive advertising caused them to overpay for the Service Plans. 2-ER-215 ¶ 67; 2-ER-218 ¶ 79; 2-ER-222 ¶ 100; 2-ER-255 ¶ 188. UCL restitution is designed to address this type of harm. *See Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 329 (2011) (recognizing economic harm where a consumer pays more because of a misrepresentation than the consumer otherwise would have paid). The district court itself recognized as much when it held Appellants had alleged "a viable theory of economic harm." 1-ER-14.

The district court's conclusion that Appellants did not seek restitution and therefore lacked UCL standing should be reversed because it cannot be reconciled with the Second Amended Complaint.

## III. The district court abused its discretion in denying leave to amend.

Courts consider five factors in assessing the propriety of leave to amend: "bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the

71

complaint." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011). "Under futility analysis, '[d]ismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment.'" *Id.* (quoting *Krainski v. Nevada ex rel. Bd. of Regents of NV. System of Higher Educ.*, 616 F.3d 963, 972 (9th Cir. 2010) (alteration in original)). Here, there was no bad faith, undue delay, or prejudice, so leave to amend turned on prior amendments and futility.

The district court found amendment futile because Salas had filed three complaints and, although this was Papanek and Steacy's first, counsel had the benefit of the court's prior order and the Letters were "simpler" than the Webpage. 1-ER-40–41. That reasoning does not support denial of leave to amend.

As to Salas, while this was his third complaint, only one amendment was in response to a court order. As to Papanek and Steacy, the court effectively imputed Salas's amendment history to plaintiffs who had none. That the same counsel represented all three plaintiffs does not justify that result where, as here, the new plaintiffs challenged a different advertisement involving distinct factual issues that the court

72

had not previously addressed. Nor does the court's observation that the Letters were simpler establish futility. The relevant question was not comparative simplicity, but whether it was clear Appellants could allege no additional facts that would state a viable claim.

Appellants maintain that their CLRA, FAL, and UCL claims were adequately alleged. Even if this Court disagrees, amendment is warranted so long as the Court can conceive of additional facts that would render those claims viable. *See Corinthian Colls.*, 655 F.3d at 995 (concluding amendment should have been permitted because the court could conceive of facts that would support plaintiff's claim).

## CONCLUSION

For these reasons, this Court should reverse the district court's dismissal of Appellants' CLRA, FAL, and UCL claims, reverse the district court's determination that Appellants lacked UCL standing because they did not seek restitution, and remand for further proceedings. In the alternative, if this Court concludes the Second Amended Complaint is deficient, it should reverse the district court's denial of leave to amend and remand with instructions to grant leave to amend.

73

Respectfully submitted,

Dated: March 23, 2026            By: *s/ Glenn A. Danas*

                                        Glenn A. Danas (270317)
Christen L. Chapman (332245)
CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265
Tel. (213) 788-4050
gdanas@clarksonlawfirm.com
cchapman@clarksonlawfirm.com

Evan E. Sumer (329181)
CONSUMER LAW FIRM, P.C.
145 Corte Madera Town Center,
No. 464
Corte Madera, CA 94925
Tel. (415) 294-1966
ems@consumerlaw.us

*Attorneys for Plaintiffs-Appellants*
*Orlando Salas, Brian Steacy, and*
*Paul Papanek*

74

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Cir. R. 32-1 because it contains 13,732 words, excluding the parts of the brief exempted by Cir. R. 32-1(c) and Fed. R. App. P 32(f).

2.  This brief complies with the typeface and type-size requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in proportionally-spaced typeface using Microsoft Word, in 14–point size.

Dated: March 23, 2026          By: *s/ Glenn A. Danas*
                                   Glenn A. Danas

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2026, I electronically filed the foregoing with the Clerk and the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 23, 2026      By: _s/ Glenn A. Danas_
                           Glenn A. Danas